1 | **PERKINS COIE LLP**
2 | Aaron J. Ver (CA SBN 295409)
  | 505 Howard Street, Suite 1000
3 | San Francisco, California 94105-3204
  | Telephone: +1.415.344.7000
4 | AVer@perkinscoie.com

5 | John R. Hardin (*pro hac vice* motion forthcoming)
  | 500 North Akard Street, Suite 3300
6 | Dallas, Texas 75201-3347
7 | Telephone: +1.214.965.7700
  | JohnHardin@perkinscoie.com

8 |
  | James Q. Walker (*pro hac vice* motion forthcoming)
9 | Stephen Hogan-Mitchell (*pro hac vice* motion forthcoming)
  | 1155 Avenue of the Americas, 22nd Floor
10| New York, NY 10036-2711
11| Telephone: +1.212.262.6900
  | JamesWalker@perkinscoie.com
12| SHoganMitchell@perkinscoie.com

13| Attorneys for Plaintiff

14|                **UNITED STATES DISTRICT COURT**
15|            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
16|                      **SAN FRANCISCO DIVISION**
17|

| | |
|---|---|
| STREAM TRADING CORP., | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CALEB MCMEANS, | |
| Defendant. | |

COMPLAINT


# COMPLAINT

Stream Trading Corp. files its Original Complaint against Caleb McMeans as follows:

## EXECUTIVE SUMMARY

1. Stream Trading Corp. was co-founded in early 2024 by two long-time proponents of blockchain transactions and decentralized finance ("DeFi").[1] In February 2024, Stream Trading Corp. launched a yield farming protocol (the "Stream Protocol"). While successful, operational challenges led Stream Trading Corp. to wind down this product by November 2024.

2. Thereafter, Stream Trading Corp. was approached by Caleb McMeans, who was known for managing complex yield farming strategies. Mr. McMeans wanted to acquire the Stream Protocol and its brand to help attract customers to his own yield farming strategies. As a result, Stream Trading Corp. and Mr. McMeans began discussing a potential acquisition.

3. In January 2025, discussions with Mr. McMeans culminated in an agreement that transferred the Stream Protocol to Mr. McMeans (the "Agreement"). Under the Agreement, Mr. McMeans also immediately assumed the rights ***and obligations*** associated with managing the depositor assets that had remained after the November 2024 winddown as well as any new depositor assets, lenders, and trading strategies. In addition, Stream Trading Corp. permitted Mr. McMeans to use the Stream brand in connection with operating the Stream Protocol.

4. Per the Agreement, after acquiring the Stream Protocol, Mr. McMeans ran it as his own business and exercised complete control over it. He controlled all on-chain trading of cryptocurrencies and off-chain business arrangements (including entering into contracts with various third parties), and he publicly identified himself as the CEO of the Stream Protocol.

5. In early November 2025, the co-founders of Stream Trading Corp. were alarmed to learn that Ryan DeMattia—a yield farming trader employed by Mr. McMeans—had lost approximately $93 million of the Stream Protocol's assets. This loss represented approximately 17.5% of the assets under management by Mr. McMeans through the Stream Protocol and triggered

---

[1] DeFi refers to an emerging financial system that uses blockchain and cryptocurrencies to enable financial services like lending, borrowing, and trading without relying on traditional intermediaries such as banks.

a ripple effect of losses across the DeFi ecosystem, impacting the Stream Protocol's depositors and other third parties doing business with Mr. McMeans.

6. The co-founders of Stream Trading Corp. immediately confronted Mr. McMeans regarding the losses. During this exchange, Mr. McMeans professed to be suicidal. This revelation, along with other concerning conduct by Mr. McMeans, prompted Stream Trading Corp. to propose establishing a "multi-sig wallet"[2] into which some of Stream Protocol's assets could be transferred. Stream Trading Corp.'s intent was to mitigate the risk of further significant losses in the event Mr. McMeans became incapacitated or unable to provide the requisite private keys to access the funds held within the Stream Protocol.

7. Mr. McMeans is now using that act of prudence to claim Stream Trading Corp. is responsible for the problems he created while running his business. Many individuals who deposited cryptocurrencies into the Stream Protocol have inquired about the status of their assets. Similarly, companies that contracted with Mr. McMeans and his sole proprietorship, Stream Trading Company, have reached out seeking to engage Stream Trading Company and Mr. McMeans on substantive matters. Mr. McMeans has refused to engage meaningfully or otherwise help to resolve the situation that he and his employee created. Instead, Mr. McMeans has asserted a number of arguments—many of which are contradictory—in an effort to avoid responsibility. Presently, Mr. McMeans refuses to take *any* action to clean up his own mess unless Stream Trading Corp. releases him from all liability for his actions.

8. Mr. McMeans's tactics are improper, misleading, and simply wrong. As a result, Stream Trading Corp. files this lawsuit to enforce the Agreement, which, among other things, transferred the Stream Protocol to Mr. McMeans for him to operate as his exclusive business. Mr. McMeans's subsequent actions and inactions in operating the Stream Protocol continue to cause

---

[2] Access to blockchain wallets are protected by secret "private keys," without which the value represented in a blockchain ledger address cannot be accessed or moved. Most wallets are secured by only one such private key. However, a multi-signature wallet ("multi-sig wallet") can be configured with multiple keys and access rules that require some combination of keys to be presented in order to move funds from the wallet (e.g., 2 of 3 keys must be presented in order to access the wallet).

COMPLAINT

harm to Stream Trading Corp., and the Agreement requires Mr. McMeans to reimburse Stream Trading Corp. for these harms.

**PARTIES**

9. Stream Trading Corp. is a Delaware corporation with its principal place of business in California.

10. Caleb McMeans is an individual and citizen of the state of Florida.

**JURISDICTION**

11. The Court has diversity jurisdiction under 28 U.S.C. § 1332 because this dispute is between citizens of different States, and the amount in controversy exceeds $75,000.

**VENUE**

12. Venue in the Northern District is proper pursuant to 28 U.S.C. § 1391(b) and (c). Stream Trading Corp.'s principal place of business is located in this district, and the parties negotiated and signed the Agreement while physically in this district.

13. Alternatively, venue is proper in this district because Mr. McMeans is subject to the personal jurisdiction of this Court with respect to this action having negotiated and signed the Agreement in this district.

14. Assignment to the San Francisco Division is proper under Civil L.R. 3-2(c) and (d), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**FACTUAL ALLEGATIONS**

**A.   Stream Trading Corp. is founded in February 2024 and launches the Stream Protocol.**

15. Stream Trading Corp. was founded in February 2024 with a vision of becoming a market leader in the creation of DeFi yield strategies. Stream Trading Corp.'s first product, the initial version of the Stream Protocol, aimed to generate returns on customers' cryptocurrencies[3]

---

[3] "Cryptocurrencies" are digital currencies in which transactions are verified and records maintained by a decentralized system using cryptography. Examples of cryptocurrencies include Bitcoin (BTC), Ether (ETH), and stablecoins such as USDC. Stablecoins are cryptocurrencies that

by investing them in other blockchain-based "delta neutral strategies,"[4] which is an example of what is commonly referred to as "yield farming."

16. To use Stream Trading Corp.'s version of the Stream Protocol ("Protocol Version 1"), users transferred cryptocurrencies to smart contracts[5] created by Stream Trading Corp. In exchange, users received a "receipt" token, which represented their right to withdraw those assets at a later date, along with any returns reported by the Stream Protocol. To access the smart contracts and perform transactions, users connected their digital wallets to the Stream Protocol's website. Once users of Protocol Version 1 transferred assets to the Stream Protocol's smart contracts, Stream Trading Corp. deployed the customers' cryptocurrencies in various blockchain-based trading strategies to generate returns. The smart contracts updated user balances based on a yield input that was manually reported by Stream Trading Corp. To withdraw their cryptocurrencies, users of Protocol Version 1 returned their receipt tokens to the smart contracts, which would then signal Stream Trading Corp. to authorize a transfer of the corresponding amount of cryptocurrency—consisting of their initial deposit plus any yield—back to the users' wallets. This process is commonly referred to as "closing a position."

17. Stream Trading Corp. announced the launch of the Stream Protocol in a February 8, 2024, Medium post. At inception, the Stream Protocol's users consisted primarily of friends and family. The protocol experienced early success in the months following its launch, but its growth slowed in late 2024. In addition, over time, the operational demands of managing the yield farming strategies that Stream Trading Corp. employed increased. As a result, in November 2024 Stream Trading Corp. made a strategic decision to wind down Protocol Version 1, redirecting its resources

---

are designed to maintain a stable value and are pegged to certain external assets, such as the US dollar or other fiat currencies.

[4] A "delta-neutral strategy" aims to create a portfolio with a net delta of zero, such that its value will not change due to small price movements in the underlying assets. Instead, profits will be derived from other factors, like volatility or time delay. This requires adopting a strategy of investment in offsetting instruments.

[5] A "smart contract" is a self-executing piece of code existing directly on a blockchain like Ethereum. Smart contracts automatically execute certain actions when predetermined conditions are met and are a key component of DeFi projects.

and business attention to a new DeFi product named Klyra—a platform designed to enable users to trade across multiple cryptocurrency exchanges simultaneously.

18. To facilitate the winddown, Stream Trading Corp. announced via the official Stream Protocol X (formerly known as Twitter) account that yield generation on the Stream Protocol would be paused and the smart contracts would be set to "withdraw only." In other words, users of Protocol Version 1 could continue to close their positions as usual, but new deposits would not be accepted and existing deposits would no longer earn additional yield.

19. Following this announcement, the vast majority of assets were withdrawn from Protocol Version 1, and Stream Trading Corp. redirected its business attention to the development of Klyra. Klyra was established as a separate brand, complete with its own website, social media presence, and technology. As a result of this transition and the sunsetting of Protocol Version 1, Stream Trading Corp. also began doing business under the name Klyra.

**B.  Stream Trading Corp. and Mr. McMeans reach an agreement to sell the Stream Protocol to Mr. McMeans.**

20. A few months after Stream Trading Corp. announced the winddown of Protocol Version 1, Stream Trading Corp.'s executives participated in a networking trip in Argentina, which was also attended by Mr. McMeans. Known in the DeFi community by his pseudonym "0xlaw," Mr. McMeans had established a reputation for his yield farming strategies, which he eventually managed through his fund, Catharsis. During this trip, Mr. McMeans raised the possibility of acquiring the Stream Protocol from Stream Trading Corp. to implement his yield farming strategies. Mr. McMeans expressed his belief that the existing brand recognition of the Stream Protocol would attract significant user deposits, thereby enabling him to generate more fee revenue.

21. The parties—Mr. McMeans in his individual capacity and Stream Trading Corp. now doing business as Klyra—thereafter negotiated and ultimately executed the Agreement, which they signed on or around January 22, 2025. Six parts of the Agreement are particularly relevant to the current dispute.

22. <u>First</u>, on January 22, 2025, Stream Trading Corp. immediately transferred the Stream Protocol business to Mr. McMeans. Mr. McMeans's version of the Stream Protocol became

operational in February 2025 ("Protocol Version 2"), and he exclusively operated the Stream Protocol, exercising sole control over all assets deposited by users thereafter, including determining deployment strategies, reporting the yield generated, and returning assets to users who requested withdrawal.

23. <u>Second</u>, because Mr. McMeans lacked the software development expertise necessary to encode smart contracts for the Stream Protocol or to operate its website, he negotiated for Stream Trading Corp. to provide certain technology services to the Stream Protocol that was now under his ownership and direction.

24. <u>Third</u>, the parties agreed that Mr. McMeans would not be required to make immediate payment to acquire the Stream Protocol. Instead, Mr. McMeans agreed to pay Stream Trading Corp. 35% of the fees generated and collected by the Stream Protocol. Additionally, whenever Mr. McMeans withdrew assets from the Stream Protocol, he agreed to make a payment to Stream Trading Corp. in accordance with its contractual share of revenues.

25. <u>Fourth</u>, Stream Trading Corp. initially retained ownership of the intellectual property associated with the "Stream" brand, although Mr. McMeans was permitted to use such intellectual property in connection with his ownership and operation of the Stream Protocol. Once Mr. McMeans paid Stream Trading Corp. $1 million in after-tax fee revenue, the intellectual property (along with certain other assets) would become eligible for transfer to a separate entity primarily owned by Mr. McMeans.

26. <u>Fifth</u>, the parties agreed that Mr. McMeans "shall maintain total transparency of where Stream positions are deployed…"

27. <u>Sixth</u>, the parties also negotiated and agreed to include a clause that made clear that Mr. McMeans would be the "responsible and liable party" in the event of theft of assets by deliberate action.

///

///

**C.    Following the parties' execution of the Agreement, Mr. McMeans thereafter operated the Stream Protocol exclusively.**

28.    After the parties signed the Agreement, Mr. McMeans (under his "0xlaw" persona) publicly announced the transition of the Stream Protocol on X:

> **Oxlaw** @0xlawlol · 2025-01-28
>
> I am proud to announce I will be heading @streamdefi as the new CEO
>
> The average retail user does not have the time, knowledge, or access to properly deploy their funds across defi to optimally generate returns on their USDC/ETH/BTC
>
> This market is massively inefficient, can be Show more
>
> 💬 44   🔁 22   ♡ 209   📊 25K

29.    Mr. McMeans then directed Stream Trading Corp. to develop Protocol Version 2 according to his specified requirements, which included creating new smart contracts, launching a redesigned website, and issuing new "receipt" tokens. Thereafter, Stream Trading Corp. transferred control of the smart contracts associated with Protocol Version 2 to Mr. McMeans, along with all cryptocurrencies it still held in connection with its operation of Protocol Version 1. Stream Trading Corp. also transferred control of the Stream Protocol X account to Mr. McMeans and gave him administrator access to the Stream Protocol Discord channel.

30.    With Protocol Version 2 operational in early 2025, Mr. McMeans maintained exclusive control over all assets and trading strategies associated with the Stream Protocol. He engaged with third parties under the Stream name, including as a new sole proprietorship, "Stream Trading Company."[6] Stream Trading Corp.'s involvement was limited to occasional technical assistance at Mr. McMeans's request. Without any involvement or prior knowledge by Stream Trading Corp., Mr. McMeans hired his own employees and entered into contracts with third parties

---

[6] It is unclear to Stream Trading Corp. what other names Mr. McMeans may have used in conducting his business.

for a variety of lending arrangements as part of his new business. Mr. McMeans reported daily yields to users of Protocol Version 2 and was responsible for facilitating user withdrawals.

31.     Mr. McMeans made several payments to Stream Trading Corp. However, Stream Trading Corp. was unable to verify whether these payments accurately reflected the 35% of fees owed under the Agreement, as Mr. McMeans maintained sole access and control over Protocol Version 2's wallets, accounts, and records.[7]

32.     During this time, Mr. McMeans implemented his own trading strategy, which encompassed both on-chain (transactions conducted directly on the relevant blockchains) and "off-chain" strategies (*e.g.*, more traditional financial transactions, such as options trading, conducted outside of the blockchain environments). Stream Trading Corp. did not have contemporaneous visibility into these off-chain activities, but it later learned that Mr. McMeans had entered into multiple written borrowing and lending agreements with other entities under the business name "Stream Trading ***Company***" (emphasis added). Upon information and belief, Mr. McMeans never established a formal entity under that name and instead operated "Stream Trading Company" as his sole proprietorship. Nevertheless, Mr. McMeans created presentations for potential investors in which he identified himself as the "founder" and CEO of the Stream Protocol and listed other individuals, including Mr. DeMattia,[8] as employees of this separate entity. None of the individuals identified by Mr. McMeans as employees of his entity had any affiliation with Stream Trading Corp. Moreover, since Mr. McMeans was not a "founder" of Stream Trading Corp., the presentations Mr. McMeans created could only have logically referenced his role in the sole proprietorship through which he operated Protocol Version 2:

---

[7] The funds that Stream Trading Corp. received were subsequently deposited in the Stream Protocol. In other words, Stream Trading Corp. is also a depositor and has suffered its own losses based on Mr. McMeans's control of the Stream Protocol. Stream Trading Corp. is not bringing any claims in this lawsuit based on its status as a depositor.

[8] Mr. DeMattia operated online under the pseudonym 0xDeimos.

-9-

**Stream's DeFi Expert Team**

**0xLaw**
Founder & CEO
Unrivaled DeFi expertise and legendary performance track record.

**0xDeimos**
Ops & Finance
DeFi hedge fund manager and crypto veteran with 10+ years onchain.

**Another 3rd guy – Luca?**
COO
it really helps to have a team of 3+ for venture deals

Stream Protocol

Date
May 2025

33. Mr. McMeans, operating as Stream Trading Company, also entered into a contract with Little Engine LLC to lend it more than $150,000,000 in stablecoins. Mr. McMeans executed this agreement without the knowledge or consent of Stream Trading Corp. Additionally, Mr. McMeans entered into a contract with Elixir Technologies Ltd in which he borrowed $68.5 million in US-dollar denominated stablecoins and pledged a corresponding amount of Protocol Version 2 receipt tokens as collateral. Mr. McMeans also executed this agreement without Stream Trading Corp.'s knowledge or consent.

34. Given Mr. McMeans's increased use of off-chain strategies and the significant increase in the total amount of assets deposited in the Stream Protocol following Mr. McMeans's launch of Protocol Version 2, Stream Trading Corp. requested that Mr. McMeans provide transparency consistent with his commitments under the Agreement by sharing sufficient information to allow Stream Trading Corp. to understand and verify the Stream Protocol's deployment of assets. Mr. McMeans deflected these requests and did not fully cooperate. For example, he refused to provide Stream Trading Corp. with the requested API (Application Programming Interface) access required to verify the positions that he reported and otherwise failed

to respond to Stream Trading Corp.'s reasonable requests for additional information regarding the Stream Protocol's trading strategies.

      **D.**    **Stream Trading Corp. becomes increasingly concerned about Mr. McMeans's failures to provide transparency into the Stream Protocol, leading to the discovery that a fund manager hired by Mr. McMeans lost over $90 million in Stream Protocol assets.**

35.    Throughout September and October of 2025, Stream Trading Corp. continued to press Mr. McMeans to uphold his contractual transparency obligations. Mr. McMeans consistently responded with delays and excuses. Around the same time, Stream Trading Corp. learned that a significant amount of user assets held by Protocol Version 2 was controlled by Ryan DeMattia, who had been hired by Mr. McMeans and marketed as an employee of Mr. McMeans's sole proprietorship. Mr. McMeans informed Stream Trading Corp. that Mr. DeMattia had invested over $90 million of Stream Protocol assets in a variety of off-chain strategies—strategies into which Mr. McMeans himself admitted he did not have full visibility.

36.    Mr. McMeans's refusal to comply with his transparency obligations ultimately compelled Stream Trading Corp.'s co-founders and executives to seek confirmation directly from Mr. DeMattia. Initially, Mr. DeMattia refused to provide any greater insight than Mr. McMeans. At the same time, Mr. McMeans began pressuring Stream Trading Corp. to stop asking questions and to simply trust him and Mr. DeMattia.

37.    Stream Trading Corp.'s need for the transparency required under the Agreement became urgent based on several actions of both Mr. DeMattia and Mr. McMeans. For example, Mr. DeMattia offered a series of patently false excuses for why he could not provide any further information, even claiming at one point that his laptop had been destroyed in a car crash. This outlandish story was demonstrably false; yet, at the same time, Mr. McMeans urged Stream Trading Corp. to stop asking questions and to believe Mr. DeMattia—all of which is reflected in the parties' messages to one another. Seeking to obtain transparency directly, on October 31, 2025, Stream Trading Corp.'s co-founders flew to Atlanta, Georgia, where Mr. DeMattia lived.

38.    Eventually, Mr. McMeans admitted that he had not memorialized his employment arrangement with Mr. DeMattia and had no way to verify Mr. DeMattia's trading positions. The

arrangement between Mr. DeMattia and Mr. McMeans was absurd; and after describing it to Stream Trading Corp.'s co-founders, Mr. McMeans recognized (and agreed) that withdrawing all assets from Mr. DeMattia's strategy was the only logical next step.

39. On the morning of November 2, 2025, Mr. McMeans admitted that Mr. DeMattia had confessed to losing nearly all the Stream Protocol's assets that Mr. McMeans had entrusted him to trade, amounting to approximately $93 million. The precise facts underlying this loss remain unclear, but upon information and belief, on October 10, 2025, Mr. DeMattia faced a margin call on a personal loan for which he lacked sufficient funds to cover, had his position liquidated, and then used Stream Protocol assets to which he had access to cover his loss.

40. At this point, there were two urgent circumstances that demanded an immediate response.

41. <u>First</u>, Mr. McMeans threatened to end his own life. When Mr. DeMattia's actions (and apparent theft) became known, Mr. McMeans informed Stream Trading Corp. that he was suicidal and made similar, contemporaneous statements in Discord:

> Stream | Law 10:46 PM
> i will be taking my life after this is the only reason i am talking here despite being told not too

42. <u>Second</u>, and at the same time, Stream Trading Corp. discovered that on November 2, 2025, Mr. McMeans *himself* had transferred approximately $2.1 million in cryptocurrency from Stream Protocol's wallet addresses to his personal wallet addresses. Mr. McMeans then routed these assets through Railgun, a DeFi protocol that utilizes smart contracts to help users obscure the source of funds and the movement of assets on blockchains.[9]

43. As Stream Trading Corp. now understood, Mr. McMeans (pursuant to the Agreement) had sole control of the private keys to all the blockchain wallets holding certain Stream Protocol assets, which were valued at tens of millions of dollars. Mr. McMeans was also actively

---

[9] Stream Trading Corp. understands that the assets were moved back by Mr. McMeans about three weeks later, after their transfer was announced on various social media platforms. Mr. McMeans used the assets to repay certain lending positions into which he had entered in connection with his operation of the Stream Protocol.

-12-

COMPLAINT

moving assets to Railgun during a time that Mr. DeMattia had already siphoned off $93 million for his own uses and while Mr. McMeans was openly stating his intention to commit suicide. His death while in sole possession of the private keys would have resulted in a complete loss of the assets remaining in those wallets. In light of this emergency, and to protect the remaining assets against further loss or theft, it was offered to have Mr. McMeans transfer the Stream Protocol assets remaining in his control to a multi-sig wallet address for which Stream Trading Corp. and Mr. McMeans would both be signatories. Mr. McMeans agreed and transferred the assets accordingly.

44.    Stream Protocol depositors expected and demanded transparency regarding the events that had transpired. In response, Stream Trading Corp. encouraged Mr. McMeans to report the $93 million loss to the public via the Stream Protocol X account and announce that all withdrawals on Protocol Version 2 would be frozen and new deposits rejected. Mr. McMeans agreed.

### E. **Mr. McMeans confuses users of the Stream Protocol and parties with whom he contracted via his sole proprietorship by suggesting that Stream Trading Corp. is responsible for performance of obligations owed to them by Mr. McMeans.**

45.    Unfortunately, Mr. McMeans's actions in the days that followed did not provide additional clarity to Stream Protocol depositors or third parties with whom Mr. McMeans had contracted since acquiring the Stream Protocol. For example, Mr. McMeans began using the existence of the multi-sig wallet that had only been established because he self-reported suicidal intentions as a basis to argue that he was not in control of the Stream Protocol or its deposits. Instead, he claimed that Stream Trading Corp. was in control. He also began telling third parties with whom he had contracted under the moniker "Stream Trading Company" that the word "Company" was "a typo" and that they should instead deal with Stream Trading Corp. Stream Trading Corp. also discovered that Mr. McMeans had deleted all of his private Discord communications with Mr. DeMattia since October 10, 2025—the same date on which, upon information and belief, Mr. DeMattia experienced liquidation of a significant personal position he held.

46.    Mr. McMeans and his lawyer then began asserting a variety of inconsistent and increasingly absurd positions as they tried on a proverbial wardrobe of novel theories. Initially, they

claimed that Mr. McMeans co-owned Stream Trading Corp. They then reversed course and said Mr. McMeans was an employee of Stream Trading Corp. After being confronted with the language of the Agreement, they next claimed that Mr. McMeans had never signed the Agreement with Stream Trading Corp. When Stream Trading Corp. provided them with a signed copy of the Agreement, they pivoted once again and asked that the Agreement be mutually rescinded. Mr. McMeans and his lawyer continue to sample new positions and theories at a quick-change artist's pace, underscoring Mr. McMeans's desperation to avoid liability for the situation he created and for which he is responsible.

### F. Stream Trading Corp. demands indemnification from Mr. McMeans under the Agreement, which Mr. McMeans refuses to provide.

47. Mr. McMeans's actions frustrated a number of entities, including multiple third parties with whom he had contracted under the name Stream Trading Company. Based on the facts described above, Stream Trading Corp. made a formal demand on Mr. McMeans for payment of damages it suffered pursuant to the Agreement, including the significant costs and attorney's fees it has incurred in connection with communications involving various third parties who claim to have suffered losses as a result of Mr. DeMattia's sabotage of the Stream Protocol. Mr. McMeans responded through his counsel that he would not honor his indemnification obligations, and instead he demanded that Stream Trading Corp. release him from all liability for his actions before he would take *any* steps toward being responsible.

48. As such, Stream Trading Corp. files this lawsuit to enforce the Agreement, including the provision that Mr. McMeans indemnify Stream Trading Corp. for any damages it incurs in connection with theft of funds from the Stream Protocol by deliberate action.

49. All conditions precedent to the filing of this lawsuit have been met, waived, or have occurred.

COMPLAINT

## CAUSES OF ACTION

## COUNT I

(Breach of Contract)

50. Stream Trading Corp. repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

51. The Agreement is a binding and enforceable contract between Stream Trading Corp. and Mr. McMeans.

52. Mr. McMeans is in breach of his obligations under the Agreement by, among other things, failing to manage the assets and Stream Protocol in a manner consistent with the mutual expectations of the signatories, failing to provide the required transparency mandated by the Agreement, and failing to indemnify Stream Trading Corp. for any and all losses incurred as a result of the theft of funds from the Stream Protocol by Mr. DeMattia while under Mr. McMeans's control and supervision.

53. Mr. McMeans's breach has caused damages to Stream Trading Corp. in the form of significant costs and attorney's fees in connection with its interactions with various third parties who claim to have suffered losses as a result of Mr. DeMattia's theft of funds from the Stream Protocol.

## COUNT II

(Declaratory Judgment)

54. Stream Trading Corp. repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

55. Under all the circumstances described herein, there exists a substantial controversy between Stream Trading Corp. and Mr. McMeans as to the Agreement. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment given the ongoing confusion caused by Mr. McMeans actions regarding the ownership of the Stream Protocol and the damages this controversy continues to cause to Stream Trading Corp., including but not limited to substantial costs and attorney's fees incurred by Stream Trading Corp.

56. The substantial controversy between the parties is definite and concrete, touches the legal relations of parties having adverse legal interests, and is such that the dispute is real and substantial, and admits of specific relief through a decree of a conclusive character regarding the proper interpretation of the Agreement and Mr. McMeans's responsibilities thereunder as the owner of the Stream Protocol, including specifically that (i) the Agreement is valid, binding, and enforceable, (ii) the Agreement transferred the Stream Protocol business to Mr. McMeans on January 22, 2025, and that Mr. McMeans thereafter solely owned and operated the Stream Protocol as his own business; and (iii) Mr. McMeans is responsible under the Agreement for the damages caused to Stream Trading Corp. as alleged in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Stream Trading Corp. prays for judgment as follows:

1. For a declaration that the Agreement is valid, binding, and enforceable;

2. For a declaration that the Agreement transferred the Stream Protocol business to Mr. McMeans on January 22, 2025, and that Mr. McMeans thereafter solely owned and operated the Stream Protocol as his own business;

3. For a declaration that Mr. McMeans is responsible under the Agreement for the damages caused to Stream Trading Corp. as alleged in this Complaint;

4. For compensatory damages in an amount to be determined at trial, but no less than $75,001;

5. For an award of prejudgment interest and cost of suit, including attorney's fees and expenses, to the extent permitted by law; and

6. For such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

# DEMAND FOR A JURY TRIAL

Stream Trading Corp. demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

Dated:  December 8, 2025

**PERKINS COIE LLP**

By: */s/ Aaron J. Ver*
Aaron J. Ver, Bar No. 295409
John R. Hardin*
James Q. Walker*
Stephen Hogan-Mitchell*

**pro hac vice* motion forthcoming*

*Attorneys for Plaintiff*